550    APPELLATE COURTS OF ILLINOIS.

Knotts v. Lake Shore & Mich. Southern Ry. Co., 172 Ill. App. 550.

## Armanis F. Knotts, Appellant, v. The Lake Shore & Michigan Southern Railway Company, Appellee.

### Gen. No. 16,875.

1. CONTRACTS—*where implied between owner and volunteer broker for compensation.* Though a mere volunteer cannot recover for services rendered without a contract of employment, yet if the owner of property knows that an alleged volunteer is a broker and is trying to effect a sale and expects compensation, and it appears that the owner encouraged the broker and led him to believe that he would be compensated, a contract will be implied, if a sale is consummated by the broker.

2. TRIAL—*when motion to direct verdict denied.* A motion to direct a verdict should be denied if there is any evidence upon which, considered in its most favorable light to the opposite party, the jury could reasonably find a verdict for such party.

3. TRIAL—*when error to direct a verdict.* It is error to direct a verdict for the defendant in an action for commissions for the sale of real estate, where plaintiff was a real estate broker and the correspondence and conversations with the defendants seem to indicate an understanding that he was representing them and expected compensation, and that they did not dissent.

4. AGENCY—*when of real estate agent ratified.* Though a real estate broker begins work for the vendor as a mere volunteer his agency is acquiesced in and ratified, if the vendor understands that he expects a commission if a sale is effected and no inclination to disagree is indicated, but he is knowingly permitted to act upon that understanding until the benefit of his work is received.

Appeal from the Municipal Court of Chicago; the Hon. STEPHEN A. FOSTER, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1910. Reversed and remanded. Opinion filed October 3, 1912.

BOMBERGER & SAWYER and MARVIN E. BARNHARDT, for appellant.

GLENNON, CARY, WALKER & HOWE, for appellee.

MR. JUSTICE FITCH delivered the opinion of the court.

In the summer of 1905, Armanis F. Knotts, the

appellant (plaintiff in the court below), who was a real estate agent, located at Hammond, Indiana, learned that the United States Steel Company desired to build a new plant and that it was looking for land in Indiana for that purpose. The Steel Company's attorney asked the plaintiff if he had any of that kind listed for sale; and at his suggestion appellant saw Judge Gary, the chairman of the Board of Directors of the Steel Company, regarding the matter. Judge Gary told him that if the Steel Company could find a good location and the price was right, it would buy land for a plant, but would pay no commissions, which must be paid by the sellers. Following this conversation, plaintiff sold for divers parties, to the Gary Land Company, a subsidiary corporation connected with the Steel Company, about 8,000 acres of land in the vicinity of Pine Station, Indiana, which is on the line of the railroad of the defendant company. The defendant then owned a tract of 170 acres adjoining one of the parcels of land thus sold. On July 7 or 8, 1905, plaintiff called on S. W. Brown, superintendent of the western division of the defendant company in Chicago; told him that a large industry wished to locate near Chicago; that he, plaintiff, thought that he could sell land in Indiana to it, if he got enough together to suit its purpose, and asked Brown whether defendant would sell the 170-acre tract at Pine Station to such a concern. Brown replied by asking plaintiff what concern it was. Plaintiff declined to tell him, and Brown then asked the plaintiff whom he desired or wanted to represent. Plaintiff told Brown that he desired to represent the seller; that he had to represent the seller and could not represent the buyer, for the reason that it was definitely understood between him and the prospective buyer that the buyer would not pay any commissions.

Evidently Brown took up the matter with his superiors; for on July 20, 1905, he wrote to the plaintiff:

"I beg to say, that I am instructed to inform you that we wish to help in every way to locate industries, and especially paying ones, on our line. I believe there will be no trouble in purchasing the property, but application must be made in writing and submitted to the executive board of directors of the New York Central Line, who have to pass on all sales of property before permission can be given. Will you be able to arrange to have such application made out in a formal manner?" To this letter plaintiff replied, July 26, 1905: "Complying with your suggestion, I hereby make application to the executive board of directors of the New York Central Line for the least possible cash price at which a very large and wealthy corporation could secure that portion of the land in Calumet county, at Pine Station," (describing the tract) "for the purpose of locating thereon an industry that would employ from 1,500 to 2,000 men, with very large ship-ments in and out. If the price and inducements are satisfactory to the concern wishing the location, and it can secure other lands adjoining on the east and west sufficiently to answer its purpose, which I am now trying to do, I will then arrange so that the transaction may be carried on directly between the parties interested."

Several interviews with Brown followed, and in September, 1905, it was suggested by another Mr. Brown, who was present at one such interview, that the plaintiff be sent to Cleveland to see Mr. Marshall, the general manager of the defendant company. Brown gave the plaintiff a pass over defendant's railroad to Cleveland for that purpose, and on September 19th, plaintiff called on Marshall in Cleveland and repeated to him in substance the conversation he had previously had with Brown. Marshall insisted on knowing the name of the prospective buyer. Plaintiff objected, but when Marshall said that it would be impossible for him to do anything until he knew the name of the buyer, the

plaintiff gave Marshall that information under his pledge not to divulge it.   On September 20, 1905, plaintiff, by letter, requested Marshall to make a proposition for the sale of the land, suggesting that it was necessary to act speedily.  In reply, Marshall wrote to plaintiff, September 22, 1905: "If, by selling the land which we own in the vicinity of Pine Station, and which is outlined in red on the attached blue print, a plant satisfactory to our company will be located at that point, we will sell the property at the average selling price of adjoining property, we to receive for that portion of our property fronting on the lake, the average price of the adjoining lake front property, and to receive for the remainder of our property the average price of the adjoining land surrounding.  *  *  *  The above subject to the approval of our board of directors who, under our rules, must pass on these matters."  To this letter plaintiff replied, September 25, 1905:  "Your letter and blue print received.  After Mr. Brown of your company, at Chicago, called up and reported to me what you said, I arranged with the head of the concern to whom I wished to sell the property, to have him take up the matter with your company directly."

At the interview with Mr. Marshall in Cleveland, Marshall suggested to plaintiff that as Judge Gary and Mr. Newman, the president of the defendant company, both lived in New York, and they would have to ultimately pass on the matter, he, the plaintiff, ought to go to New York to see Mr. Newman.  Following this suggestion, the plaintiff, on October 2, 1905, called on Newman in New York City.  Plaintiff testified that Newman greeted him as though he knew who he was and what he came for.  Plaintiff told Newman the purpose of his visit.  Newman said, "Who are you representing?"  Plaintiff replied: "I want to represent you in the sale of the land," to which Newman responded, "No, I mean, to whom are you going to sell the land?"  Plaintiff then asked Newman if he knew

554    APPELLATE COURTS OF ILLINOIS.

Knotts v. Lake Shore & Mich. Southern Ry. Co., 172 Ill. App. 550.

Judge Gary, and receiving an answer in the affirmative, plaintiff said, "I wish you would call him up," whereupon, Newman called up Judge Gary on the telephone. Plaintiff heard Newman say, "Mr. Knotts of Hammond is here with reference to some land that we own in Lake county, Indiana, and he informed me that you would like to buy it for the purpose of locating a factory there," and also overheard Newman say to Judge Gary in substance: "We will sell you the land at the prevailing price for land in that vicinity." Plaintiff then returned to Hammond, and on October 16, 1905, wrote to Marshall, telling him that he had seen Newman and "heard him dictate a letter relative to the deed, etc.", and inquiring as to the progress of the sale. On the same day, plaintiff wrote to Newman, inquiring what progress had been made "to consummate the sale of the Pine Station, Lake county, land to Judge Gary and his associates," to which Newman replied, October 18, 1905, "I understand that Judge Gary will appoint some one representing his company to take up with Vice-President Brown, the matter of price for the land. When an agreement on that has been reached, the necessary steps will at once be taken to prepare deeds, etc., for execution."

After the sale was concluded, plaintiff sent a bill to Marshall, January 12, 1906, which was returned with a letter stating: "So far as my knowledge goes, we did not sell the land through you, and made no agreement to pay you a commission." Plaintiff then brought suit in the Municipal Court, where it was tried before a jury. The plaintiff was the only witness, and at the conclusion of his evidence, the court, on motion of defendant, instructed the jury to find the issues for the defendant, which was done. A motion for new trial was interposed and overruled, and judgment entered on the verdict, from which the plaintiff appeals.

It is contended by appellant's counsel that the court erred in directing a verdict for defendant, and by ap-

pellee's counsel that there was no evidence tending to show a contract of employment, and that the plaintiff was a mere volunteer.  While it is true that a mere volunteer cannot recover compensation for services rendered without any contract of employment, or rendered in spite of the refusal or against the wish and desire of the owner, (Wilcox v. Andrews, 150 Ill. App. 27; Morton v. Barney, 140 Ill. App. 333; Rees v. Spruance, 45 Ill. 308), yet, where it appears that the owner knows that the alleged volunteer is a broker, that he is endeavoring to effect a sale to a prospective buyer and expects to receive compensation for his services if successful, and where it also appears that with such knowledge on the part of the owner, the broker was encouraged by the owner to aid in the sale, and led by the owner to believe that he would receive compensation, a contract to pay compensation will be implied, if the sale is thereafter consummated through the efforts of such broker.  Steidl v. McClymonds, 90 Minn. 205; Kinder v. Pope, 106 Mo. App. 536; Tinkham v. Knox, 18 N. Y. Supp. 433.  By such conduct, the owner impliedly approves the agency of the broker.

In Story on Contracts, 5th Ed., Sec. 491, it is said: "So also the silence of either party will import assent to the terms of the contract whenever it would have been incumbent on him to express his dissent if he did not agree thereto, or where his silence is explicable only by the presumption of his assent."  It is not claimed that either Brown or Marshall dissented when plaintiff told them he desired to represent the seller because the buyer would not pay any commission, but appellee's counsel insist that Newman did express his dissent, when, in response to plaintiff's statement, "I want to represent you," Newman said: "No, I mean to whom are you going to sell the land?" It is urged that the word "No" thus used was an expression of dissent to the overtures made by the plaint-

556        APPELLATE COURTS OF ILLINOIS.

Knotts v. Lake Shore & Mich. Southern Ry. Co., 172 Ill. App. 550.

iff.   We cannot thus construe Newman's statement, in the light of what followed, and of the other evidence in the record.   The sentence quoted evidently meant, "You do not understand me.   What I meant by my question was, to whom are you going to sell the land?" At any rate, that was a reasonable inference from the testimony and one the jury would have the right to draw.   We think the court erred in directing a verdict.   Upon a motion to direct a verdict, the court cannot weigh the evidence.   If there is any evidence, (beyond a mere scintilla of evidence) from which, when considered in the light most favorable to the plaintiff, a jury could, "without acting unreasonably in the eye of the law," find a verdict for the plaintiff, the motion must be denied.   Libby v. Cook, 222 Ill. 206.   We think it is a fair and reasonable inference from the plaintiff's evidence and the correspondence above mentioned, that the officers of the defendant company fully understood that the plaintiff expected to receive a commission if, through his efforts, a sale was consummated, and that they not only did not do or say anything to indicate their disapproval or disinclination to agree with the plaintiff in this reasonable expectation, but on the contrary, knowingly permitted him to believe that such was their understanding of the matter, and to act upon that belief until after they had received and accepted the benefit of his work. By so doing, they acquiesced in and ratified his agency, even though he began his work as a mere volunteer.

The judgment of the Municipal Court will be reversed and the cause remanded.

*Reversed and remanded.*